1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10  TARA D. SADLER and DONALD SADLER,
    Wife and Husband,

11                              Plaintiffs,

12  v.

13  STATE FARM MUTUAL AUTOMOBILE
    INSURANCE COMPANY, a foreign insurer,

14

15                              Defendant.

No. C07-995Z

ORDER

16

17       THIS MATTER comes before the Court on motions to seal, to strike, and for

18  summary judgment brought by defendant State Farm Mutual Automobile Insurance

19  Company ("State Farm") and on a motion to bifurcate brought by plaintiffs Tara and Donald

20  Sadler.  Having reviewed all papers filed in support of, and in opposition to, the various

21  motions, the Court does hereby ORDER:

22       (1)    State Farm's motion to seal, docket no. 86, is GRANTED; the unredacted

23              Declaration of Joseph D. Hampton, docket no. 64, shall remain under seal;

24       (2)    State Farm's motion to strike, docket no. 74, is GRANTED IN PART and

25              DENIED IN PART;

26       (3)    State Farm's motion for summary judgment, docket no. 63, is GRANTED;

ORDER - 1

(4)     Plaintiffs' motion to bifurcate, docket no. 78, is STRICKEN as moot;

(5)     Plaintiffs' remaining claims are DISMISSED with prejudice; and

(6)     The Clerk is directed to enter judgment accordingly and to send a copy of this
        Order to all counsel of record.

**Background**

Plaintiffs allege that State Farm exacerbated injuries, allegedly sustained by Tara Sadler in a car accident, by delaying payment of Personal Injury Protection ("PIP") benefits, thereby postponing surgery until it was too late to be effective. The undisputed facts are as follows. Tara Sadler first sought treatment on March 19, 2004, from Central Washington Physical Therapy, PS, a clinic in Yakima, for neck stiffness and pain that reportedly began on March 9, 2004, after she had experienced flu-like symptoms with significant coughing spells. _See_ Gorman Dep. at Exh. 5, Exh. 2 to Hampton Decl. (docket no. 65); T. Sadler Dep. at Exh. 10, Exh. 3 to Hampton Decl. On the intake form Ms. Sadler signed that day, in response to the question whether her injury was connected with a motor vehicle accident, she circled "NO." _See_ T. Sadler Dep. at Exh. 10, Exh. 3 to Hampton Decl. Ms. Sadler regularly visited the clinic from March 19 until mid-May 2004. _See_ Exh. 9 to Koehler Decl. (docket no. 71) (redacted version at docket no. 88).

On April 12, 2004, plaintiffs initiated a claim for PIP benefits under an automobile insurance policy issued by State Farm. _See_ Activity Log at SF00085, Exh. 4 to Hampton Decl. At that time, they indicated to State Farm that Ms. Sadler's injury related to an incident occurring on March 11, 2004. _Id._ They described having "to react to avoid [an] accident" with a vehicle being chased by a police car. _Id._ They represented to State Farm that no police report had been generated because no collision took place. _Id._

In his subsequent deposition, Donald Sadler testified that the near accident happened in the late afternoon on February 29, 2004. _See_ D. Sadler Dep. at 8:25-9:4, Exh. 1 to Koehler Decl. When asked to explain the discrepancy between his testimony and the

incident date provided earlier to State Farm, Mr. Sadler replied, "We got a copy of the police report that said it was the 29th when that happened." D. Sadler Dep. at 31:8-9, Exh. 1 to Koehler Decl. Neither party has provided to the Court a copy of any police report related to this matter.

On April 13, 2004, State Farm generated and sent to Ms. Sadler a standard letter summarizing the PIP benefits available under the policy at issue. T. Sadler Dep. at Exh. 14, Exh. 3 to Hampton Decl. Accompanying the letter was an application form, which plaintiffs completed and which Ms. Sadler signed on April 19, 2004. D. Sadler Dep. at Exh. 1, Exh. 5 to Hampton Decl. The application again stated that the date of the near collision was March 11, 2004. *Id.*

After weeks of receiving treatment from Central Washington Physical Therapy, Ms. Sadler opted in mid-May 2004 to seek the services of a chiropractor. *See* Exh. 9 to Koehler Decl. During the period between May and June 2004, Ms. Sadler made fifteen visits to the Family Chiropractic Centre in Yakima and was seen by James R. Milliron, D.C. *See* Exhs. 11 & 16 to Koehler Decl.

On June 9, 2004, Ms. Sadler was evaluated by St. Elmo Newton III, M.D. of Seattle Orthopaedic & Fracture Clinic. *See* D. Sadler Dep. at Exh. 3, Exh. 5 to Hampton Decl. In his summary, Dr. Newton indicated that Ms. Sadler suffered a neck injury during "an unusual auto accident of 03/11/2004." *Id.* He diagnosed Ms. Sadler as having a C5 disk protrusion. *Id.* He discussed conservative treatment measures, including epidural steroids, with plaintiffs, but they indicated a desire to proceed directly to surgery "because they are fearful that their funds will be expired and then she will still need the surgery." *Id.* Dr. Newton opined that the disk protrusion should be removed posteriorly and, because he had expertise in only the anterior approach, he referred Ms. Sadler to Jayashree Srinivasan, M.D. of Western Washington Neurosurgery in Seattle. *Id.*

Dr. Srinivasan examined Ms. Sadler on June 11, 2004. *See* D. Sadler Dep. at Exh. 4, Exh. 5 to Hampton Decl. Dr. Srinivasan reviewed the results of a magnetic resonance imaging ("MRI") scan and concluded that Ms. Sadler had a "large disk herniation at C5-C6 on the right side extending into the foramen" and "right C6 radiculopathy secondary to the disk herniation." *Id.* Dr. Srinivasan opined that surgery was "reasonable," and she indicated in a letter to Dr. Newton that she had "scheduled the patient for surgery in the near future." *Id.*

In her subsequent deposition, Dr. Srinivasan explained that, although she believed surgery was a reasonable course of treatment, she did not think Ms. Sadler's condition was urgent because she had no signs of spinal cord injury. Srinivasan Dep. at 10:3-14, Exh. 7 to Hampton Decl. In her parlance, the term "emergent" means needing treatment that same day, while the word "urgent" describes a situation requiring attention within one to two weeks. Srinivasan Dep. at 46:24-47:9, Exh. 18 to Koehler Decl. Dr. Srinivasan never indicated to Ms. Sadler that surgery should occur within a specific time period. Srinivasan Dep. at 12:1-4, Exh. 7 to Hampton Decl.

According to Mr. Sadler, contrary to the statement in her letter to Dr. Newton, Dr. Srinivasan did not in fact schedule Ms. Sadler for surgery. *See* D. Sadler Dep. at 52:14-21, Exh. 1 to Koehler Decl. Instead, Dr. Srinivasan indicated that her office would contact State Farm to obtain authorization for the surgery. *Id.* at 52:21-25. State Farm's records, however, do not reflect a call from Dr. Srinivasan's office during the days immediately following her initial examination of Ms. Sadler. Rather, the first call about surgery that was logged by State Farm occurred on June 14, 2004, and it was from Donald Sadler. *See* Activity Log at SF00663, Exh. 3 to Koehler Decl. Elise Smith, a State Farm Claim Representative, fielded the call and advised Mr. Sadler that State Farm cannot "preapprove" surgery and that she would be recommending scheduling an independent medical examination ("IME"). *Id.*

On June 21, 2004, Gina Milliron of the Family Chiropractic Centre sent a fax to Elise Smith stating, "Time is of the essence.  Tara is in a lot of pain and discomfort.  We appreciate your help in expediting her claim.  Please advise ASAP on when the IME is scheduled."  Exh. 30 to Koehler Decl.

On June 22, 2004, Ms. Smith indicated in a log entry that an IME had been scheduled for July 19, 2004, through Medical Consultants Network, Inc. ("MCN") with a chiropractic doctor, an orthopedist, and a neurologist.  *See* Activity Log at SF00662, Exh. 3 to Koehler Decl.  On July 7, 2004, Jamie Kolling, after assuming responsibility for plaintiffs' PIP claim, concluded that the IME should instead be scheduled with an orthopedic surgeon, and set an appointment for July 15, 2004, with Larry Gorman, M.D.  Activity Log at SF00050, Exh. 3 to Koehler Decl.

After examination of Ms. Sadler, but without having reviewed the chart notes from Central Washington Physical Therapy, Dr. Gorman concluded that Ms. Sadler suffered from a "[h]erniated disc C5-6 secondary to the motor vehicle accident of March 11, 2004." Gorman Dep. at Exh. 1, Exh. 2 to Hampton Decl.; *see id.* at 35:4-6, 35:23-36:4, 36:21-37:22. He authored a report that was sent to State Farm on July 21, 2004, opining that "surgery should be arranged very promptly."  *See* Report at 6, Gorman Dep. at Exh. 1, Exh. 2 to Hampton Decl.; *see also* Activity Log at SF00047, Exh. 3 to Koehler Decl.  He also attempted to speak with Jamie Kolling, but his office was advised that State Farm's policies prohibited direct contact between claim representatives and IME providers.  *See* Activity Log at SF00047 & SF00048, Exh. 3 to Koehler Decl.  *But see* Gorman Dep. at 21:15-23:15 (indicating that he tried to call State Farm immediately after examining Ms. Sadler, but the claim representative had already left for the day, that he himself never received a return call, and that he was never directly told he was not supposed to talk to the claim representative).

Dr. Gorman advised Ms. Sadler against receiving any further physical therapy because the usually included range of motion exercises could worsen her condition.  Gorman

Dep. at 20:7-15, Exh. 36 to Koehler Decl. Dr. Gorman also recommended that Ms. Sadler

be fitted for a cervical collar to stabilize her head and neck. *Id.* at 20:16-21:5. Ms. Sadler

followed the latter suggestion and visited the emergency room at Yakima Valley Memorial

Hospital on July 15, 2004. Exh. 39 to Koehler Decl. She was examined by Craig M. Singer,

M.D., who expressed consternation about Ms. Sadler's refusal "to have a neurosurgical

evaluation or referral." *Id.* He described the situation as "very perplexing and concerning"

because "any sort of fall . . . or recurrence of trauma could result in paraplegia or

quadriplegia," but the patient, who has "out-of-town" doctors and attorneys, "does not want

any of the involvement of the local neurosurgeon or any steroids from me to maybe improve

her symptoms." *Id.* In his treatment notes, Dr. Singer resignedly wrote, "But we will give

her the C-collar." *Id.*

After receiving Dr. Gorman's IME report on July 21, 2004, Jamie Kolling contacted

plaintiffs' attorney's office and advised that State Farm does not preauthorize or prepay for

treatment, but surgery appeared "reasonable" in light of the IME report. *See* Activity Log at

SF00047, Exh. 3 to Koehler Decl. On July 29, 2004, Ms. Sadler underwent surgery.

Exh. 40 to Koehler Decl. Dr. Srinivasan reported that "sufficient retraction could not be

performed on the nerve root to expose the disc space," that "the disc was probably more

medial than could be accessed from a posterior approach," and that "therefore no discectomy

was performed." *Id.* A second surgery was performed, using an anterior approach, on

August 4, 2004. Exh. 41 to Koehler Decl. During this subsequent procedure, Dr. Srinivasan

removed the herniated disc and replaced it with a bone graft taken from the right iliac crest (a

portion of the pelvic girdle), securing it with an Atlantis anterior cervical plate attached with

13-millimeter screws. *Id.* In her operative report, Dr. Srinivasan indicated that Ms. Sadler

"tolerated the procedure well" and "[t]here were no complications." *Id.*

In their complaint, plaintiffs allege that, after the second surgery, "Ms. Sadler's

medical condition stabilized, but she was left with catastrophic physical injury and

permanent disability in her neck, shoulder, right upper extremity, right lower extremity and head." Complaint at ¶ 2.21, Exh. A to Notice of Removal (docket no. 1). In connection with the pending motion for summary judgment, neither party has proffered any medical or expert assessment of Ms. Sadler's current condition or disabilities. In relation to previous discovery motions, however, the Court received the report of State Farm's expert, James M. Blue, M.D., who examined Ms. Sadler in April 2008 pursuant to Fed. R. Civ. P. 35, and who concluded that Ms. Sadler's neurological complaints "are completely nonphysiologic and suggest either a hysterical paralysis and numbness or an examination of a malingerer." Report at 9, Exh. C to Koehler Decl. (docket no. 47). Thus, the extent and nature of Ms. Sadler's injuries apparently remain in dispute, but the parties have not raised the issue in conjunction with the pending motion for summary judgment.

On August 25, 2006, Dr. Srinivasan signed a form statement opining that, "[h]ad Tara's surgery been done in early to mid June of 2004, on a more probable than not basis, Tara's outcome would have been good/better than what she has now." Srinivasan Dep. at Exh. 15, Exh. 1 to Hampton Supp. Decl. (docket no. 75). The form asserted that the "only basis for delaying surgery in early June of 2004 was due to State Farm withholding approval for payment of surgery costs." _Id._ The form, however, indicated that Dr. Srinivasan did not contact State Farm to get approval to perform the surgery until July 29, 2004. _Id._

On August 31, 2006, Dr. Srinivasan signed another form statement, outlining the same opinions regarding Ms. Sadler's probable prognosis with an earlier surgery and the reason for delaying the surgery. Srinivasan Dep. at Exh. 16, Exh. 1 to Hampton Supp. Decl. The second form, however, stated that Dr. Srinivasan first called State Farm on June 11, 2004, to obtain authorization for the surgery. _Id._ When deposed on April 14, 2008, Dr. Srinivasan did not recall ever speaking with anyone at State Farm. _See_ Srinivasan Dep. at 18:8-11, Exh. 7 to Hampton Decl.

Both of the August 2006 statements described Ms. Sadler's need for surgery as "emergent." *See* Srinivasan Dep. at Exhs. 15 & 16, Exh. 1 to Hampton Supp. Decl. In her subsequent deposition, Dr. Srinivasan conceded that use of the term "emergent" was "wrong." Srinivasan Dep. at 46:23, Exh. 18 to Koehler Decl. In early June 2004, Dr. Srinivasan did not think Ms. Sadler's condition was even urgent, let alone emergent. *See* Srinivasan Dep. at 10:10-14, Exh. 7 to Hampton Decl. Ms. Sadler did not develop leg symptoms until late June or early July, Srinivasan Dep. at 48:18-20, Exh. 18 to Koehler Decl., and had Dr. Srinivasan been aware of such symptoms, she would have "proceeded on a more expeditious basis," and "probably would have just gone from the front," thereby addressing the situation in only one, rather than two, surgeries. *See* Srinivasan Dep. at 38:20-39:3, Exh. 7 to Hampton Decl.

With regard to the cause for delaying surgery, Donald Sadler testified in his deposition that Dr. Srinivasan called to advise him State Farm had "put everything on hold." D. Sadler Dep. at 55:18-24, Exh. 1 to Koehler Decl.[1] According to Mr. Sadler, when he inquired what could be done to proceed forward with surgery, Dr. Srinivasan indicated that it "came down to money" and she refused to perform the procedure unless someone committed in advance to pay for it. *Id.* at 56:18-23, 57:9-13. Mr. Sadler has averred Dr. Srinivasan told him that, if plaintiffs paid $3,000 in advance, she would "go ahead and do the surgery and we'd worry about [the balance] later." *Id.* at 57:18-20.

In her deposition, Dr. Srinivasan denied ever having a discussion with plaintiffs about the cost of surgery, Srinivasan Dep. at 11:15-17, Exh. 18 to Koehler Decl., or about how they would pay for surgery, Srinivasan Dep. at 32:4-8, Exh. 7 to Hampton Decl. Dr. Srinivasan testified that, if she had concerns about a patient's financial situation, she generally sent the patient in advance to the patient financial services department at the hospital, but she could not recall whether she made such referral for Ms. Sadler. *See*

---

[1] State Farm has moved to strike this portion of Mr. Sadler's deposition testimony.

Srinivasan Dep. at 32:16-21, Exh. 7 to Hampton Decl.  In his deposition, Mr. Sadler acknowledged being aware that "Swedish [Hospital] has got certain programs" to "help you with the bill," D. Sadler Dep. at 54:5-7, Exh. 1 to Koehler Decl., but plaintiffs did not pursue those options "because it all happened so fast" between "State Farm saying no and getting an attorney," *Id.* at 62:23-63:6.  Plaintiffs also did not investigate obtaining charitable care in their local area, for example at Memorial Hospital or at St. Elizabeth Hospital, then known as Providence Yakima Medical Center, and they did not contact the State of Washington for assistance.  *Id.* at 63:7-17.

Under the policy issued to plaintiffs, State Farm's PIP medical expenses limit was $25,000.  *See* Declarations and Policy at § II, p. 14, col. P2, Exh. 1 to Hampton Decl.  The PIP loss of income limit was $10,400.  *Id.*  Ms. Sadler's medical expenses far exceeded policy limits.[2]  *See* Exh. 13 to Hampton Decl.  The parties do not dispute that State Farm has already paid its policy limits.  *See* Exh. 4 to Hampton Decl.; Exh. 3 to Koehler Decl.

In this action, plaintiffs originally asserted eight causes of action:  (i) breach of good faith duty; (ii) breach of fiduciary duty; (iii) violation of Washington's Consumer Protection Act; (iv) negligence; (v) intentional misrepresentation; (vi) breach of contract; (vii) tort of outrage; and (viii) punitive damages under the Illinois Consumer Fraud and Deceptive Business Practices Act.  The Court previously dismissed plaintiffs' fifth (intentional misrepresentation) and eighth (punitive damages) causes of action upon State Farm's motion under Fed. R. Civ. P. 12(b)(6).  Order dated September 20, 2007 (docket no. 12).  State Farm now moves for summary judgment as to the remaining six claims.

**Discussion**

---

[2] Swedish Medical Center billed $18,598.40 for the first surgery and $24,598.38 for the second surgery. Exh. 13 to Hampton Decl.  Dr. Srinivasan billed $5,045.00 for the first surgery and $13,059 for the second surgery.  *Id.*  Seattle Radiologists APC, Physicians Anesthesia Services, and Barbara Bourdeau, RNFA billed in total another approximately $8,500.  *Id.*  Thus, medical expenses for both surgeries amounted to almost $70,000.  In addition, prior to surgery, Ms. Sadler incurred charges for both physical therapy and chiropractic care.

**A.      Motion to Strike**

State Farm moves to strike as hearsay the form signed by Dr. Srinivasan on August 31, 2006, and Donald Sadler's deposition testimony about Dr. Srinivasan's statement that she called State Farm.  *See* Reply at 2-3 (docket no. 74).  With respect to the "heavily coached" form apparently prepared by plaintiffs' counsel and completed by Dr. Srinivasan, State Farm argues that Dr. Srinivasan has recanted much of the information contained therein.  Such contention goes to the weight, not the admissibility, of the evidence.  As to State Farm's hearsay objection to the form, State Farm does not proffer any analysis.  For example, State Farm does not indicate whether the document dated August 31, 2006, might constitute a business record, or whether the contents of the document reflect Dr. Srinivasan's anticipated trial testimony.  The Court therefore DENIES the motion to strike the form signed by Dr. Srinivasan.  On the other hand, the Court GRANTS, on hearsay grounds, the motion to strike Mr. Sadler's deposition testimony that Dr. Srinivasan told him she had called State Farm.  *See* Fed. R. Evid. 801, 802, & 803.[3]

**B.      Summary Judgment Standard**

The Court should grant summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is material if it might affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In support of its motion for summary judgment, the moving party need not negate the opponent's claim, *Celotex*, 477 U.S. at 323; rather, the moving

---

[3] Even if, however, the Court were to consider such hearsay evidence, the result would not change.  The earliest Dr. Srinivasan would have contacted State Farm was on June 11, 2004, after examining Tara Sadler.  The undisputed evidence is that, on June 14, 2004, Donald Sadler telephonically initiated a discussion with State Farm about the need for surgery.  The difference in time is only three days and would not affect the Court's analysis of the issues in the case.

ORDER - 10

party will be entitled to judgment if the evidence is not sufficient for a jury to return a verdict in favor of the opponent, *Anderson*, 477 U.S. at 249.

When a properly supported motion for summary judgment has been presented, the adverse party "may not rely merely on allegations or denials in its own pleading." Fed. R. Civ. P. 56(e). Rather, the non-moving party must set forth "specific facts" demonstrating the existence of a genuine issue for trial. *Id.*; *Anderson*, 477 U.S. at 256. A party cannot create a genuine issue of fact by simply contradicting his or her own previous sworn statement, *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999), or by asserting "some metaphysical doubt" as to the material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Likewise, discrediting the testimony proffered by the moving party will not usually constitute a sufficient response to a motion for summary judgment. *Anderson*, 477 U.S. at 256-57.

To survive a motion for summary judgment, the adverse party must present affirmative evidence, which "is to be believed" and from which all "justifiable inferences" are to be favorably drawn. *Id.* at 255, 257. When the record, however, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, summary judgment is warranted. *See* *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006); *see also* *Beard v. Banks*, 548 U.S. 521, 529 (2006) ("Rule 56(c) 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322)).

## C.    Breach of Contract

Plaintiffs' sixth cause of action asserts breach of express and implied terms of their insurance contract with State Farm. Complaint at ¶ 3.6, Exh. A to Notice of Removal (docket no. 1). The relevant provisions of the insurance policy read:

We will pay for *bodily injury* to an *insured* caused by an *automobile* accident:

1.  Medical Expenses. These are reasonable and necessary expenses incurred within three years of the date of the accident for:

    a.  medical, surgical, X-ray, dental, ambulance, hospital and professional nursing services, and

    b.  eyeglasses, hearing aids and prosthetic devices.

    Expenses are reasonable only if they are consistent with the usual fees charged by the majority of similar medical providers in the geographical area in which the expenses were incurred for the specific medical service.

    Services are necessary only if the services are rendered by a medical provider within the legally authorized scope of the provider's practice and are essential in achieving maximum medical improvement for the *bodily injury* sustained in the accident.

    We have the right to make or obtain a utilization review of the medical expenses and services to determine if they are reasonable and necessary for the *bodily injury* sustained.

. . . .

We will pay any amount due:

a.  to the *insured*, or as to medical expenses, to any *person* or organization providing the services;

. . . .

Payments will be made on a monthly basis within 30 days after we have proof of the amount due.

. . . .

1.  The Most We Pay

    a.  The most we will pay an *insured* for each benefit is the amount shown in the schedule for *your* coverage symbol.

Policy at § II, pp. 11, 12-13, & 14, Exh. 1 to Hampton Decl. (emphasis in original). For the coverage symbol or designation "P2," which was applicable to plaintiffs, the amount shown in the above-referenced schedule was $25,000. *Id.* at p. 14; *see* Declarations, Exh. 1 to Hampton Decl. In its motion for summary judgment, State Farm argues that plaintiffs have failed to identify the express or implied terms of the contract that they allege State Farm breached. Plaintiffs offer no response. State Farm has undisputedly paid its policy limits, and the Court therefore GRANTS summary judgment as to the breach of contract claim and DISMISSES with prejudice plaintiffs' sixth cause of action.

**D.    Consumer Protection Act**

In their third cause of action, plaintiffs contend that State Farm violated Washington's Consumer Protection Act ("CPA").  Complaint ¶ 3.3, Exh. A to Notice of Removal (docket no. 1).  A CPA claim may be based on a *per se* or a non-*per se* unfair or deceptive trade practice.  *See Daly v. Unitrin, Inc.*, 2008 WL 2403706 (E.D. Wash.).  A violation of certain Washington insurance statutes or regulations constitutes a *per se* unfair or deceptive trade practice.  *Id.* at *2.  Only an insured may assert such *per se* CPA claims against an insurance company.  *Id.*  Here, although plaintiffs, as insureds, would be entitled to allege a *per se* claim, and although plaintiffs apparently seek to proceed under a *per se* theory, *see* Response at 22-23 (docket no. 70), they do not in their complaint or their response to the pending motion for summary judgment identify which Washington statute or regulation State Farm allegedly violated.  Plaintiffs indirectly cite to WAC 284-30-330, which contains 19 practices defined as unfair methods of competition or deceptive acts, but they do not indicate which, if any, of the regulatory provisions apply in this case.  Given plaintiffs' failure to adequately plead or argue the merits, the Court GRANTS summary judgment in favor of State Farm and DISMISSES with prejudice plaintiffs' *per se* CPA claim.

With regard to a non-*per se* CPA claim, plaintiffs bear the burden of proving that (i) State Farm engaged in an unfair or deceptive act or practice; (ii) such act or practice occurred within a trade or business; (iii) such act or practice affected the public interest; (iv) plaintiffs suffered an injury to their business or property; and (v) a causal relationship exists between State Farm's act or practice and plaintiffs' injury.  *See, e.g.*, *Robinson v. Avis Rent A Car Sys., Inc.*, 106 Wn. App. 104, 113, 22 P.3d 818, 823 (2001).  State Farm contends that plaintiffs cannot establish the requisite injury to business or property.  Washington courts have consistently held that personal injuries are not recoverable under the CPA.  *See Ambach v. French*, 141 Wn. App. 782, 788, 173 P.3d 941 (2007) (citing *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 858 P.2d 1054 (1993));

*Michael v. Mosquera-Lacy*, 140 Wn. App. 139, 147, 165 P.3d 43 (2007) ("Personal injury claims are not subject to the CPA."), *review granted*, 163 Wn.2d 1033, 187 P.3d 268 (2008); *Stevens v. Hyde Athletic Indus., Inc.*, 54 Wn. App. 366, 370, 773 P.2d 871 (1989) ("actions for personal injury do not fall within the coverage of the CPA").

Plaintiffs do not offer much analysis in response to State Farm's asserted basis for summary judgment. Plaintiffs state only that State Farm's argument is "unworthy," citing *Mulcahy v. Farmers Ins. Co.*, 152 Wn.2d 92, 95 P.3d 313 (2004), and they point to Ms. Sadler's loss of her job as evidence of injury to business or property, citing *Levy v. N. Am. Co. for Life & Health Ins.*, 90 Wn.2d 846, 586 P.2d 845 (1978). Neither of the cases plaintiffs reference address the issue here, namely whether a claim that an insurance company's improper delay in paying benefits, which exacerbated physical injuries resulting from a near collision with a third person, is cognizable under Washington's CPA. In *Mulcahy*, the Washington Supreme Court was confronted with an issue of first impression concerning whether the insurer at issue was required to provide first-party no-fault benefits to its own insureds in accordance with British Columbia's universal compulsory insurance law. 152 Wn.2d at 94-95, 105-06. The *Mulcahy* Court reversed the lower court's application of Washington law, instead concluding that British Columbia law governed and obligated the insurer to provide no-fault benefits up to $150,000 in Canadian funds. *Id.* at 105-07. Because the lower court's resolution of the plaintiff's bad faith and CPA claims relied in part on an incorrect choice-of-law determination, the Supreme Court reversed summary judgment and remanded for further proceedings. *Id.* In doing so, the *Mulcahy* Court acknowledged that the insurer might have a legitimate defense that its acts were performed in good faith under an arguable interpretation of existing law and therefore not in violation of the CPA, but the Court observed that whether the insurer's conduct was reasonable constituted an issue of fact precluding summary judgment. *Id.* at 106. Nowhere

ORDER - 14

in the *Mulcahy* decision does the Supreme Court deal with the question whether the plaintiff could establish the requisite injury to business or property.

Likewise, the *Levy* decision is not on point. In *Levy*, the insurer rescinded the plaintiff's disability policy on the basis of plaintiff's alleged failure to disclose a pre-existing health condition. 90 Wn.2d at 848. The Washington Supreme Court held that the plaintiff stated a cause of action under the CPA because wrongful refusal to pay an insurance claim constituted a *per se* unfair or deceptive trade practice. *Id.* at 850. Therefore, the *Levy* Court concluded that the trial court erred in dismissing the plaintiff's claims for consequential, compensatory, and punitive damages; the plaintiff was entitled under the CPA to actual damages, attorney's fees, and specified punitive damages. *Id.* at 849-50. The *Levy* case is distinguishable for at least two reasons. First, unlike in *Levy*, here, State Farm did not deny Ms. Sadler's claim for PIP benefits, but instead paid its policy limits. Second, in contrast to *Levy*, in which the plaintiff simply sought the amount due under the policy and did not allege that the insurer was liable for the injury that rendered him disabled, here, plaintiffs assert that State Farm's actions proximately caused Ms. Sadler's paralysis. Thus, plaintiffs' reliance on the *Levy* decision is misplaced.

The Washington cases addressing the "injury to business or property" element of a CPA claim support State Farm's request for summary judgment. For example, in *Stevens*, the plaintiff was injured while wearing softball cleats sold by one of the defendants, P&E Athletic Sports Store, Inc. ("P&E"). 54 Wn. App. at 367. The Court of Appeals affirmed the trial court's grant of summary judgment in favor of P&E as to the plaintiff's CPA claim because personal injury fell outside the purview of such cause of action. *Id.* at 369-70. In doing so, the *Stevens* Court specifically rejected the plaintiff's contention that she suffered injury to business or property because she was required to pay hospital, physician, and rehabilitative expenses. *Id.* at 370. In addition, the Court of Appeals took note of the difference in statutes of limitations between CPA claims (four years) and personal injury

claims (three years), indicating a need to segregate one from the other. _See id._ The _Stevens_ case is analogous in that plaintiffs here assert a personal injury claim, which they seek to convert into a cause of action under the CPA by identifying the damages consequential to Ms. Sadler's resulting disability, namely unpaid medical expenses and wage loss. The _Stevens_ decision, however, stands for the proposition that plaintiffs cannot in this manner alter the fundamental nature of their claim and they cannot proceed under the CPA.

In two fairly recent cases, the Court of Appeals has further examined the dichotomy between personal injury and business or property injury. In _Michael_, the plaintiff sued her periodontist under the CPA for using cow bone during a grafting procedure after she had explicitly requested otherwise. 140 Wn. App. at 142-44. In _Ambach_, the plaintiff asserted a CPA claim against her surgeon and a hospital for performing a medically unnecessary shoulder surgery for financial gain. 141 Wn. App. at 785-86. In both cases, the Court of Appeals distinguished between a medical provider's conduct related to the entrepreneurial aspects of medical practice, which is cognizable under the CPA, and a medical provider's competence or lack thereof in rendering services, which cannot be redressed via a CPA claim. 141 Wn. App. at 787-88; 140 Wn. App. at 150. In _Michael_, the plaintiff's injury was viewed as affecting business or property because she left the periodontist's office with a different product (cowbone) than was represented as being sold to her. 140 Wn. App. at 148. In _Ambach_, the plaintiff's injury was viewed as affecting business or property because she paid the increased cost of unneeded surgery instead of the lower cost of more conservative treatment. 141 Wn. App. at 790. In contrast, plaintiffs here are not alleging that they received an insurance policy not conforming with their expectations or that they paid artificially-inflated insurance premiums; they are asserting that the manner in which State Farm processed their claim for PIP benefits was negligent or worse, resulting in personal injury to Ms. Sadler. Plaintiffs' claim is not cognizable under the CPA, and the

Court GRANTS summary judgment and DISMISSES with prejudice plaintiffs' third cause of action.

**E.    Breach of Good Faith or Fiduciary Duty and Negligence**

Plaintiffs allege three different, but related, legal theories for relief.  Plaintiffs' first cause of action asserts breach of good faith duty, their second cause of action claims breach of fiduciary duty, and their fourth cause of action contends that State Farm was negligent and violated its duty to exercise reasonable care.  Complaint at ¶¶ 3.1, 3.2, & 3.4, Exh. A to Notice of Removal (docket no. 1).  State Farm moves for summary judgment as to these claims on the grounds that (i) plaintiffs cannot establish any duty to pre-approve surgery; (ii) plaintiffs cannot demonstrate State Farm's actions or omissions were a proximate cause of Ms. Sadler's injury; and (iii) as a matter of law, State Farm acted fairly and reasonably.  Plaintiffs' response merely describes the generic duties of an insurer and argues the chronological facts of the case.  *See* Response at 18-22 (docket no. 70).  Plaintiffs do not directly address State Farm's contentions that it did not owe the precise duty at issue, namely to pre-approve surgery, and that it was not the proximate cause of delaying Ms. Sadler's surgery.

Indeed, plaintiffs' own insurance expert, Robert B. Dietz, agrees that State Farm had no duty to pre-approve surgery or other medical treatment.[4]  *See* Dietz Dep. at 100:6-9, 111:4-13, Exh. 14 to Hampton Decl.  By its express terms, the PIP provision required only that State Farm reimburse plaintiffs or directly pay a treatment provider within thirty days after receiving proof of the amount due.  Policy at § II, p. 12-13, Exh. 1 to Hampton Decl. ("We will pay any amount due . . . to the *insured*, or as to medical expenses, to any *person* or organization providing the services . . . .  Payments will be made on a monthly basis within 30 days after we have proof of the amount due.").  PIP coverage is no-fault insurance,

---

[4] In his deposition, Mr. Dietz opined that State Farm was obligated to provide merely a "noncommittal committal" or "some assurance" that PIP benefits would be paid.  *See* Dietz Dep. at 110:14-111:2, Exh. 14 to Hampton Decl.

"the purpose of which is to provide for speedy *payment* of medical bills and *compensation* for lost income for accident victims." 7A Am. Jur. 2d Auto. Ins. § 521 (emphasis added); *see Van Noy v. State Farm Mut. Auto. Ins. Co.*, 142 Wn.2d 784, 787, 16 P.3d 574 (2001) (PIP is "essentially no-fault coverage for medical expenses arising from bodily injuries sustained in an automobile accident"). An insurer, however, may refuse to pay PIP benefits for one of the statutorily enumerated reasons, which include intentionally self-inflicted injury, acts of war, and injury while participating in a race or using a motor vehicle during the commission of a felony, RCW 48.22.090, or because the medical or hospital expenses are (i) not reasonable, (ii) not necessary, (iii) not related to an accident, or (iv) were not incurred within three years of an automobile accident, WAC 284-30-395(1)(a)-(d).

In articulating the bases for which an insurer may deny or limit PIP benefits, both the Washington Legislature and the Insurance Commissioner envisioned that an insured might, or perhaps generally would, become liable for medical or hospital expenses before the insurer makes a decision on a claim. The Insurance Commissioner has specifically recognized that insurers might and may consult with health care professionals in assessing the reasonableness or necessity of medical treatment by imposing as a regulatory requirement that such consultants be "currently licensed, certified, or registered to practice in the same health field or specialty" as the insured's treatment provider. WAC 284-30-395(3)(a). To the extent that an insured's medical condition requires immediate, "emergent" care, nothing in the statute mandating PIP coverage, *see* Laws of 1993, ch. 242 (codified in RCW 48.22.005-.105), or the regulations setting forth standards for prompt, fair, and equitable PIP settlements, *see* WAC 284-30-395, requires an insurer to pre-approve or pre-pay treatment expenses, or to otherwise expedite its coverage decision. In sum, plaintiffs cite no basis for their implied contention that PIP benefits offer the same type of guaranteed coverage generally provided by health insurance, and they cannot prove that State Farm breached any duty.

Moreover, plaintiffs cannot establish that lack of insurance or inability to pay formed a legitimate basis for a hospital or its medical staff to refuse treatment. Pursuant to both statute and regulation, hospitals and their medical staff are prohibited from adopting or maintaining "practices or policies which would deny access to emergency care based on ability to pay." RCW 70.170.060(2); WAC 246-453-060(2). They are also precluded from engaging in actions that would significantly reduce "the proportion of patients who have no third-party coverage and who are unable to pay for hospital services." RCW 70.170.060(1)(a); WAC 246-453-060(1)(a). State Farm therefore argues that any delay in Ms. Sadler's surgery and her allegedly resulting injuries were not proximately caused by State Farm's handling of her PIP claim. Had Ms. Sadler needed or desired the surgery before late July 2004, any hospital's refusal to render treatment for financial reasons would have been in violation of Washington law. Thus, the five-week period during which State Farm evaluated the reasonableness and necessity of surgery was neither the cause-in-fact nor the legal cause of Ms. Sadler's injuries; rather, plaintiffs opted to wait, and they failed to explore available arrangements for affordable or free medical care, of which they were undisputedly aware. _See_ Comments to WPI 15.01 (proximate cause has two elements: cause-in-fact, which requires a "but for" or physical connection between an act and an injury; and legal causation, which inquires whether liability should attach as a matter of law given the cause-in-fact of the injury); _see also_ WPI 20.01 & 320.01 (proximate cause is an element of both negligence and insurance bad faith claims).

Rather than explaining how they can prove both existence of a duty and proximate cause, plaintiffs provide a laundry list of actions or omissions that they believe constitute bad faith or negligence on State Farm's part. Plaintiffs complain about delay in scheduling an IME, about the claim representative following corporate policy and declining to speak directly with the doctor performing the IME until after his report was completed, about lack of contact with Ms. Sadler to inquire about her welfare, about the absence of substantive

communication with Ms. Sadler's treating physicians, about failure to consult an in-house regional Injury Claim Trainer nurse regarding the consequences of delaying Ms. Sadler's surgery, and about not deviating from standard procedure in an effort to expedite the coverage decision. _See_ Response at 20-21 (docket no. 70). Plaintiffs also cast aspersions concerning the academic credentials of State Farm's claim representatives. _Id._ at 2, 12 (describing Elise Smith as having an associate in arts degree and Jamie Riordan, formerly Jamie Kolling, as being a high school graduate). Plaintiffs, however, fail to cite any case, statute, or regulation outlining a duty that State Farm breached or requiring State Farm to handle PIP claims in a manner different than how it dealt with Ms. Sadler's request for benefits.[5]

Under Washington law, insurers do not owe "true" fiduciary obligations to their insureds; instead, they have a "quasi-fiduciary" relationship with their insureds, which requires them to exercise "a high standard of good faith" and "to deal fairly and give 'equal consideration' in all matters" to their insureds' interests. _Van Noy_, 142 Wn.2d at 792, 794. In this case, State Farm previously moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss plaintiffs' breach of fiduciary duty claim as duplicative of their cause of action for breach of good faith, but the Court denied the motion in light of the procedural posture and dicta in _Van Noy_, which suggested that a plaintiff may proceed under both theories. _See_ Order dated Sep. 20, 2007 (docket no. 12) (contrasting Justice Talmadge's dissent, opining that an insurer owes only a duty of good faith to its insured, with the majority's response, indicating doubt about whether the duty of good faith differed from the quasi-fiduciary duty of an insurer, but reiterating that an insurer owes more than mere good faith in the first-party insurance context). In response to State Farm's motion for summary judgment, plaintiffs have

---

[5] Plaintiffs reference WAC 284-30-395, but they do not indicate which, if any, provision State Farm allegedly violated. Indeed, the regulation does not appear relevant because it "applies only where the insurer relies on the medical opinion of health care professionals to deny, limit, or terminate medical and hospital benefit claims," WAC 284-30-395, and, in this case, State Farm paid its PIP policy limits.

provided no analysis concerning how their breach of fiduciary duty claim differs from their bad faith claim, and the Court therefore treats the two causes of action as redundant, with both proceeding under the theory that State Farm did not deal fairly with plaintiffs and/or give equal consideration to plaintiffs' interests. Pursuant to that rationale, plaintiffs' claim fails as a matter of law.

Although plaintiffs made a claim for PIP benefits in April 2004, State Farm was not aware until June 14, 2004, that surgery was being recommended. From April through mid-June, Ms. Sadler's fairly conservative treatment needs appeared consistent with the nature of the accident, a near-collision occurring on a city street having a speed limit of 35 mph. *See* Exh. 5 to Koehler Decl. (incident happened on North First Street between F and G Streets); *see also* Yakima Municipal Code § 9.50.370 (speed limit on North First Street from D Street to the north city limit is 35 mph). When, two months after the initial claim, surgery was suddenly being discussed, State Farm was understandably suspicious. Within approximately a week, however, State Farm had identified a facility to perform an IME. Roughly two weeks later, State Farm realized that the originally scheduled IME was inappropriate, and it made an appointment with a proper specialist for a date that was four days earlier. Thus, plaintiffs' contention that the switch in medical professionals scheduled to conduct the IME caused delay is not supported by the evidence, and plaintiffs' implied assertion that State Farm could have or should have arranged for the IME to be completed on quicker timing is based on nothing more than speculation.

Plaintiffs' other accusations about how State Farm acted unfairly or in its own interests are equally unavailing. In essence, plaintiffs complain that State Farm did not handle their PIP claim outside the usual course. To accept plaintiffs' view, however, would put an insurer in an untenable position; the insurer would risk liability simply by following legitimate policies aimed at consistent, fair, and efficient handling of claims, as well as uniformity of coverage decisions. Moreover, plaintiffs' apparent proposition that deviating

from standard protocol would have netted an earlier "noncommittal committal" from State Farm is shear conjecture. For example, an IME in mid to late June 2004 might have been conducted by a different orthopedic surgeon who might have reached a contrary conclusion, or perhaps by the same physician who might have formed the opposite opinion due to the earlier timing of the IME. Moreover, conversations between the doctor performing the IME and the claim representative might have resulted in the doctor learning of Ms. Sadler's inconsistent statements about the cause of her injury. In sum, had State Farm departed from its policies in the manner plaintiffs suggest, the results of the IME might not have been as favorable to plaintiffs, and plaintiffs would now be complaining that State Farm did not conform to its own standards. The Court rejects this type of "no win" legal reasoning.

As to their breach of fiduciary duty, bad faith, and negligence claims, plaintiffs have failed to meet their burden as the nonmoving party of coming forward with affirmative evidence demonstrating a genuine issue for trial. They have not established the existence of a duty that State Farm breached, a sufficient nexus between State Farm's handling of their PIP claim and Ms. Sadler's injury, or a failure on State Farm's part to act fairly, giving equal consideration to plaintiffs' interests. Thus, the Court GRANTS summary judgment and DISMISSES with prejudice plaintiffs' first, second, and fourth causes of action.

## F.    Outrage

In their seventh cause of action, plaintiffs pleaded the tort of outrage. Complaint at ¶ 3.7, Exh. A to Notice of Removal (docket no. 1). In ruling on State Farm's earlier motion pursuant to Fed. R. Civ. P. 12(b)(6), the Court declined to dismiss the claim because plaintiffs might be able to proffer evidence to support their allegation that State Farm purposely and unjustifiably delayed processing their request for PIP benefits as part of a nationwide scheme to increase its profits. *See* Order dated Sep. 20, 2007 (docket no. 12). The Court opted to allow plaintiffs the chance to further develop their case for outrage. *Id.*

at 10.  Plaintiffs have not made much of the opportunity, devoting only a half page of their response brief to the claim.  *See* Response at 23:20-24:7 (docket no. 70).

Under Washington law, the elements of outrage are:  (i) extreme and outrageous conduct; (ii) intentional or reckless infliction of emotional distress; and (iii) actual result to the plaintiff of severe emotional distress.  *Kloepfel v. Bokor*, 149 Wn.2d 192, 195, 66 P.3d 630 (2003); *Dombrosky v. Farmers Ins. Co.*, 84 Wn. App. 245, 261, 928 P.2d 1127 (1997).  The claim must be predicated on conduct that is "so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Kloepfel*, 149 Wn.2d at 196; *Dombrosky*, 84 Wn. App. at 261.  Plaintiffs have not met this standard.  They have not delivered evidence of unjustifiable delay or inappropriate cost-containment measures.  They have not described conduct that goes beyond the bounds of decency.  They have not even provided factual support for the contention that they have, or at least Ms. Sadler has, suffered severe emotional distress; no declaration or relevant deposition testimony has been offered or cited.  Thus, the Court GRANTS summary judgment and DISMISSES with prejudice plaintiffs' seventh cause of action.

**Conclusion**

For the foregoing reasons, summary judgment is GRANTED in favor of State Farm and all of plaintiffs' remaining claims are DISMISSED with prejudice.

The Clerk is directed to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

DATED this 22nd day of September, 2008.


Thomas S. Zilly
United States District Judge